Lakeside Park Co., Appellant, *v.* Forsmark.

Argued May 1, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*E. V. Buckley*, with him *L. R. Rickard*, for appellant.

*Martin E. Cusick*, with him *Donald R. McKay*, and *Wiesen, Cusick, Madden, Joyce, Acker and McKay*, for appellee.

OPINION BY MR. JUSTICE BOK, July 2, 1959:

The single question is whether or not Sandy Lake, in Mercer County, is navigable. The court below held that it was. We think this was error.

What depends is that defendant wants to make commercial use of his shore-front property, which he may do if the lake is navigable and public, but which he may not do if it is non-navigable and private.

The lake is 27th in size among the State's 254. It is 5070 feet long and 1930 feet at its widest point. It has

a prevailing depth of 25 feet and a maximum of 40 to 50 feet, and has no well defined outlet. It is fed by springs and covers 149.7 acres. It is described in the Commonwealth's Water Resources Inventory Report, published in 1917, which contains these items, among others: "Utilization—ice harvesting, summer resort, and water supply for a magnesia manufacturing plant. Navigation—motor boats and rowboats. Ownership—private and corporate: not limited to shore line."

Such commercial glory as the lake had occurred between 1890 and 1920, but mainly around the turn of the century. Railhead on both north and south sides brought many excursionists, and a steamer and barge made irregular trips across the lake. There was a dock, a pier, a ticket office, a hotel and some organized amusement. People came to swim, fish, boat, and drink. Finally, the crowd so increased that the steamer was unable to handle them and the railroad ran its tracks around the lake, which solved the problem.

The present use of the lake by the plaintiff, which owns most of the bed, is the operation of summer cottages and facilities for bathing, fishing, and boating on its own property. Sporadic fishing in boats hired from others is objected to.

Defendant's whole case for navigability depends on these past uses, now forty to sixty-five years agone. His argument is that the lake is susceptible of navigation in fact and hence that it is navigable in law. This is good law for rivers but must be accepted with caution for lakes.

The State's rule for rivers is well stated in *Cleveland & Pittsburgh Railroad Co. v. Pittsburgh Coal Co.*, 317 Pa. 395, 176 A. 7 (1935), as follows: " 'Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being

used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water': The Daniel Ball, 10 Wall. 557, 563; The Montello, 20 Wall. 430, 439; U. S. v. Holt State Bank, 270 U. S. 49; U. S. v. Utah, 283 U. S. 64; Flanagan v. Philadelphia, 42 Pa. 219."

The difference in modes of trade and travel upon a long thin roadway of water joining regions and communities, which a river is, and upon a small lake, is obvious. Commerce may exist on both and it may move on both, but such movement on a 150-acre lake, unless it is an adequate link in a chain of commercial intercourse, remains local and insignificant in comparison with the argosies of transport that move along the great rivers of the Commonwealth.

Defendant tries to make a commercial highway of Sandy Lake, out of the long-vanished steamer, with its two-foot draft and its capacity of thirty-five persons, that hurried back and forth across the mile of water, or its barge that might hold a hundred people for dancing. This falls far short of qualifying as a highway for commerce or a link of a chain, within the reasonable intendment of that phrase. People came to stay and enjoy the lake as an end in itself, not as an incident in a journey along a trade-route.

There is a definite body of lake law in Pennsylvania. It consists, with one exception to be mentioned later, of thirteen cases involving eight lakes of generally comparable size with Sandy Lake, some smaller and some a bit larger. They follow:

1. Baylor Lake, in Lackawanna County, 4000 feet long and 1600 feet wide and containing 125 acres, has been before this court four times: *Reynolds v. Commonwealth*, 93 Pa. 458 (1880); *Baylor v. Decker*, 133 Pa. 168, 19 A. 351 (1890); *Loughran v. Matylewicz*, 367

Pa. 593, 81 A. 2d 879 (1951) ; and *Shaffer v. Baylor's Lake Association,* 392 Pa. 493, 141 A. 2d 583 (1958). It has been used commercially for fishing, boating, ice harvesting, winter skating, sleighing, watering cattle, and logging.

2. Naomi Lake, in Monroe County, is a mile long and a third of a mile wide, and covers 210 acres. It has been here three times: *Miller v. Lutheran Association,* 331 Pa. 241, 200 A. 646 (1938) ; *Miller v. Miller,* 331 Pa. 252, 200 A. 652 (1938) ; and *Miller v. Miller,* 118 Pa. Superior Ct. 38, 179 A. 248 (1935). Its commercial uses include bathing, boating, and fishing.

3. Lily Pond (Long or Beach Pond), in Luzerne County, is a mile long by half a mile wide, and consists of approximately 250 acres. It was here in *Smoulter v. Boyd,* 209 Pa. 146, 58 A. 144 (1904), and its uses were boat hire, vacationing, fishing, and lily gathering. Its owner owned the bed under its waters.

4. Echo Lake, in Monroe County, is a small lake half a mile long by a sixth wide, and covering 40 acres. It was used for boating, bathing, and fishing, and was in litigation in *Shinn v. Rosenberger,* 347 Pa. 504, 32 A. 2d 747 (1943).

5. Bassett Pond, in Lackawanna County covers 50 acres and has been used for fishing. It appears in *Gibbs v. Sweet,* 20 Pa. Superior Ct. 275 (1902), and it provided water power for its owner's mill.

6. Lily Lake (Wall Pond) in Lackawanna County, covers 84 acres and was used commercially for ice harvesting and fishing. It is the subject of *Fuller v. Cole,* 33 Pa. Superior Ct. 563 (1907).

7. Sawkill Pond, in Pike County, covers 80 acres, was used for boating, and had a dock for row boats and a raft for swimming. It is discussed in *Cryer v. Sawkill Camp,* 88 Pa. Superior Ct. 71 (1926), and was called "commercially non-navigable."

8. Finally, Lake Quinsigmond, or Bronson's Pond, in Wayne County, covers 150 to 200 acres and has been used since 1905 for fishing, boating, swimming, and cutting ice: later it became a reservoir. It appears at *Matthews v. Bagnik,* 157 Pa. Superior Ct. 115, 41 A. 2d 875 (1945).

In all of these cases the lakes were called "nonnavigable" or "unnavigable and private". The point of decision was not their non-navigability, which was assumed as a fact in each case. The significant thing is that the lakes were accepted as non-navigable despite the commercial uses to which they were put.

The remaining and exceptional case, relied on by appellee and by the court below, is *Conneaut Lake Ice Co. v. Quigley,* 225 Pa. 605, 74 A. 648 (1909). This lake, three and a half miles long, a mile wide, an average 50 feet deep, and covering 1500 acres, is ten times the size of Sandy Lake and one of the State's largest lakes. What makes it *sui generis* is that by the Act of March 21, 1798, 3 Sm. L. 320, it was declared public water and became part of the State's canal system. We held it navigable in fact and hence in law, as well as navigable by Act of Assembly. But then we added: "When a lake is so small as to be properly regarded as a mere pond, there is no sufficient reason for the public to assert any right in it. But that is not the case here."

What is a mere pond is nowhere decided except by the accretion of cases concerning the foregoing eight lakes. And there are other considerations.

Navigation and navigability are portentous words. They mean more than the flotation of buoyant vessels in water: if it were otherwise, any tarn capable of floating a canoe for which a charge could be made would make the water navigable. They mean more than some commercial use to which collected water is put:

if this were not so, every spring-fed pool capable of being bottled and sold for drinking water would be navigable. No single factor can control.

We can take judicial notice that there are four great areas in or touching the United States where navigation is thoroughly regulated, each by a set of laws and rules applicable to it alone: the high seas, those inland waters that connect with the high seas, the Great Lakes, and the Western Rivers. These laws and regulations cover the range of practical navigation: lights, fog and passing signals, rules of the road, safety equipment, buoyage, and pilotage. Navigation is a serious science whose proper exercise is in the public interest and for the public safety.

Property rights are also involved in the issue. In *Conneaut* we held: "Where a meandered lake is non-navigable in fact, the patentee of the land bordering on it takes to the middle of the lake; but where the lake is navigable in fact, its bed and waters belong to the state in its sovereign capacity, and the riparian patentee takes the fee only to the water's edge." Also *Cryer v. Sawhill Camp,* supra (88 Pa. Superior Ct. 71).

This is the rule of the rivers, except that low water mark is substituted for the water's edge: see *Johns v. Davidson,* 16 Pa. 512 (1851); *Flanagan v. Philadelphia,* 42 Pa. 219 (1862); *Monongahela Bridge Co. v. Kirk,* 46 Pa. 112 (1863); *Wood v. Appal,* 63 Pa. 210 (1870); *Leaf v. Pennsylvania Co.,* 268 Pa. 579, 112 A. 243 (1920).

It follows that where the owner of private lake-shore holds title to the middle, or *ad medium filum aquae,* or to a greater or lesser extent depending on his deed, his land can be trespassed upon as if the water were not there: *Smoulter v. Boyd,* supra (209 Pa. 146); *Matthews v. Bagnik,* supra (157 Pa. Superior Ct. 115).

And his bathing and fishing rights are valuable and can be assigned: *Miller v. Miller,* supra (118 Pa. Superior Ct. 38).

We should not be cavalier with such rights, which may be long settled. It is a temptation to look to other states for their solution, as we did when *Conneaut* was written, but there is now a discernible policy in Pennsylvania. That of a state with ten thousand lakes may be different from ours with only 254, especially if the foreign state lately entered the Union with a state-wide application of its eminent domain. It is less for us than for the Legislature to create another policy if it should seem desirable.

We think that the concept of navigability should not be limited alone by lake or river, or by commercial use, or by the size of water or its capacity to float a boat. Rather it should depend upon whether water is used or usable as a broad highroad for commerce and the transport in quantity of goods and people, which is the rule naturally applicable to rivers and to large lakes, or whether with all of the mentioned factors counted in the water remains a local focus of attraction, which is the rule sensibly applicable to shallow streams and to small lakes and ponds. The basic difference is that between a trade-route and a point of interest. The first is a public use and the second private.

We are of opinion that Sandy Lake is a small lake or pond and is not navigable. As we said in *Conneaut*: "The use to which the body of water may be put is the true criterion. If the body of water is sufficiently large and deep to serve the public in providing transportation to any considerable extent upon its bosom, it is sufficient to give the public an easement therein, for the purpose of transportation and commercial intercourse." That is not the case before us.

The decree is reversed. The record is remanded to the court below for the entry of a proper order consistent with this opinion. Costs to be paid by appellant.